**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

GAIL NAZARENE,

        *Plaintiff*,

    v.

KEVIN DEHMER, *New Jersey Department of Education Commissioner, et al.*,

        *Defendants*.

No. 1:25-cv-17770

**OPINION**

---

<u>**APPEARANCES**</u>:

James C. Grant
Greg Harold Greubel
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106

    *On behalf of Plaintiff.*

Vijayasri Aryama
Benjamin Shultz
Luke D. Hertzel-Lagonikos
Naima Drecker-Waxman
OFFICE OF THE ATTORNEY
  GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

    *On behalf of Defendants.*

**O'HEARN, District Judge.**

**INTRODUCTION**

This matter comes before the Court upon the Motion for a Preliminary Injunction ("Motion") filed by Plaintiff Gail Nazarene ("Nazarene"). (ECF No. 4). The Court heard oral argument on the Motion on February 17, 2026. Having considered the parties' papers and oral arguments, for the reasons that follow, Plaintiff's Motion is **DENIED**. Additionally, because the Court questions whether Plaintiff has Article III standing to pursue the claims alleged in the Complaint, (ECF No. 1), Plaintiff will be **ORDERED TO SHOW CAUSE** why this case should not be dismissed for lack of standing.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Nazarene is a resident of Alloway Township and an active member of her community. (Compl., ECF No. 1 at ¶¶ 9, 52). In November 2024, the residents of Alloway elected Nazarene to serve on the Alloway Township Board of Education (the "Board") for a term beginning in February 2025 and ending in December 2027. (*Id.* ¶ 53).

During her 2024 election campaign, Nazarene used a personal Facebook page titled "Gail Nazarene for Alloway School Board" to communicate with voters and solicit their views about issues affecting the Alloway Township School District. (*Id.* ¶ 54). After prevailing in the election, she continued to use social media for community outreach, but retitled her Facebook page "Gail Nazarene for Alloway." (*Id.* ¶ 60). Nazarene uses social media to engage constituents about public school matters and to solicit their feedback regarding issues affecting the district. (*Id.* ¶¶ 10, 55, 61, 65).

For example, on March 30, 2025, while the Board was considering a potential tax increase, Nazarene posted: "If taxes will need to be raised by 30% to keep the school open what is your opinion?" (*Id.* ¶ 61). In some, though not all, of her posts, she included an express disclaimer that

2

she was speaking in her personal capacity and not on behalf of the Board. (*Id.* ¶¶ 64–65). Certain posts by Nazarene prompted criticism from members of the community and her colleagues, including the Board president and a school administrator. (*See id.* ¶¶ 58, 62, 63). Both expressed concern that Nazarene's communications might run afoul of the New Jersey School Ethics Act ("Act"). (*See id.*).

The Act governs the conduct of "school officials," including elected school board members. *See* N.J. STAT. ANN. §§ 18A:12-23–24. The Act generally prohibits conflicts of interest and bars officials from using their positions to secure unwarranted personal advantages. *See id.* § 18A:12-24. It also establishes a binding Code of Ethics ("Code") applicable specifically to elected school board members, like Nazarene. *See id.* § 18A:12-24.1. Most pertinent here, the Code provides that board members must not "take any private action that may compromise the board."[1] *Id.* § 18A:12-24.1(e).

Though the Act and Code are ultimately enforced by the New Jersey School Ethics Commission (the "Commission") and the Commissioner of Education (the "Commissioner"), "any person" may file a complaint alleging a violation. *Id.* § 18A:12-29(a). After a complaint is filed, the Commission affords the accused an opportunity to respond and then determines whether probable cause exists to find a violation. *Id.* § 18A:12-29(b). If probable cause is found, the matter is referred to the Office of Administrative Law ("OAL") for a hearing; if not, the Commission dismisses the complaint as a "final agency action." *Id.* Upon completion of any OAL hearing, the

---

[1] The Code contains multiple provisions governing a range of conduct for school board members, including duties relating to policy-making, confidentiality, conflicts of interest, and the welfare of students. *See* N.J.S.A. § 18A:12-24.1(a)–(j). Nazarene, however, does not seem to mount a wholesale challenge to the Code. Rather, her claim is directed principally at the Defendants' interpretation and application of § 18A:12-24.1(e). (*See* Pl.'s Br., ECF No. 4-1 at 25 ("The commission and commissioner have grounded the state's restrictions on school board members speaking publicly primarily on subsection 12-24.1(e) of the code of ethics . . . .")).

Commission, by majority vote, determines whether the conduct constitutes a violation, or whether the complaint should be dismissed. *Id.* § 18A:12-29(c). If a violation is found, the Commission recommends a sanction to the Commissioner, who then acts on that recommendation. *Id.*

With the criticism of her peers in mind, and the threat of potential administrative sanction looming, Nazarene began regularly including disclaimers in certain social media posts, stating that she was speaking in her personal capacity and not on behalf of the Board. (Compl., ECF No. 1 at ¶¶ 62–65). Nevertheless, in April 2025, Nazarene's fellow Board member Sara Cobb ("Cobb") filed an ethics complaint against Nazarene. (*Id.* ¶ 67; *see also* Compl. Ex. C, ECF No. 1-4 (ethics complaint filed by Sara Cobb)). The Cobb complaint alleged that certain Facebook posts authored by Nazarene—some including disclaimers and at least one without— violated several Code provisions. (*See* Compl. Ex. C, ECF No. 1-4). Nazarene formally responded to the Cobb complaint and asserted that her communications with constituents were protected by the First Amendment. (Compl., ECF No. 1 at ¶¶ 67–68; *see* Compl. Ex. D, ECF No. 1-5 (Nazarene response to the Cobb complaint)).

Following the ethics complaint by Cobb, Nazarene alleges that she refrained from speaking on social media and in other mediums on matters she otherwise would address. (Compl., ECF No. 1 at ¶¶ 69–72). For example, she alleges that she has not publicly commented about the proposed regionalization of Alloway's school district, nor has she explained her opposition to a recent school budget that she found to be problematic and not in the best interest of her constituents. (*See id.* ¶¶ 73–79).

Rather than await review and potential action from the Commission as to Cobb's complaint, Nazarene filed this lawsuit. After the Complaint was filed, the pending ethics complaint by Cobb was automatically placed in abeyance, as mandated by state law. *See* N.J. STAT. ANN. §

18A:12-32 ("The commission shall not process any complaint, issue a final ruling or issue any advisory opinion on a matter actually pending in any court of law or administrative agency of this State."). Notwithstanding the abeyance, and no action having been taken against her, Nazarene alleges that Defendants' past interpretation and enforcement of the Act have forced her to choose between self-censorship and the risk of formal discipline, and that this chill on her speech violates her First Amendment rights as an elected official to speak on matters of public concern. (Compl., ECF No. 1 at ¶¶ 70–71, 80–84). Her Complaint names as Defendants, in their official capacities, the current Commissioner, Kevin Dehmer; Commission chairperson, Robert W. Bender; and Commission members Michael Carucci, Mark J. Finkelstein, Dennis Roberts, Carol E. Sabo, and Richard Tomko, (collectively, "Defendants"). (*Id.* ¶¶ 11–13, 88–99).

Along with the Complaint, Nazarene filed the instant Motion for a Preliminary Injunction, (ECF No. 4), which asks the Court to enjoin Defendants "from enforcing [the Act] to prevent [Nazarene] from speaking about matters of public concern in any medium pending a final judgment," (Proposed Order, ECF No. 4-2).

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 65 empowers courts to grant temporary and preliminary injunctive relief when warranted. FED. R. CIV. P. 65. "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). To obtain a preliminary injunction under the Rule, a movant must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant [temporary or preliminary relief], should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transam. Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). Of these factors, the first two are "most critical," and a movant's failure to establish either at the "gateway" requires the denial of the requested relief. *Reilly*, 858 F.3d at 179 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

Typically, to obtain a preliminary injunction, the plaintiff bears the burden of demonstrating a likelihood of success on the merits. However, in First Amendment cases, the government bears the burden of proof as to the constitutionality of a law, and thus the plaintiff "must be deemed likely to prevail" unless the government meets its burden. *Reilly*, 858 F.3d at 180 (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)). This is because "the burdens at the preliminary injunction stage track the burdens at trial," and for First Amendment purposes the burden of demonstrating the constitutionality of a law rests with the government. *Id.* (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). In any event, the plaintiff still bears the burden to establish that their claims are presently justiciable before the Court reaches the merits of their claim for preliminary injunctive relief. *See, e.g.*, *Clapper v. Amnesty Intl. USA*, 568 U.S. 398, 411–12 (2013).

### III.    DISCUSSION

Before the Court can evaluate the merits of issuing a preliminary injunction, it must first decide whether Nazarene has pre-enforcement standing. *See Neighborhood Toxic Cleanup Emergency v. Reilly*, 716 F. Supp. 828, 830 (D.N.J. 1989) ("Because the court cannot evaluate plaintiff's claim for injunctive relief if it does not have jurisdiction, it must decide the jurisdictional question before it evaluates plaintiff's request for preliminary injunctive relief."). She does not. And because the Court is without subject-matter jurisdiction when a plaintiff lacks standing, *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007), the Court may dismiss the matter

6

upon consideration of the instant Motion, *see* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). However, in order to afford Nazarene an opportunity to be heard on the issue, and since neither party addressed in their briefing whether the Complaint should be dismissed for lack of standing, the Court will instead order Nazarene to show cause why the Complaint should not be dismissed for lack of standing.[2]

## A. Nazarene Does Not Have Pre-Enforcement Standing

Every plaintiff must satisfy the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing generally, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).

For injury in fact, the plaintiff must show an injury that is both "concrete and particularized" and "actual or imminent." *Susan B. Anthony List v. Driehaus* ("*SBA List*"), 573 U.S. 149, 157–58 (2014). In the context of a pre-enforcement challenge to a statute limiting speech, "the threatened enforcement of a law" itself can rise to a sufficient Article III injury because an individual need not suffer from actual enforcement as a "prerequisite to challenging the law." *Id.* at 158. In such context, to establish a constitutionally sufficient injury, the plaintiff must show that they "(1) intend to take action that is (2) 'arguably affected with a constitutional interest' but is (3) arguably forbidden by the [l]aw, and (4) the threat of enforcement against them is substantial."

---

[2] Although Defendants have indicated their intent to move to dismiss for lack of standing, (*see* ECF No. 35 at 3), no such motion is presently before the Court. Moreover, defense counsel suggested at oral argument that dismissal may not be warranted based solely on the Court's resolution of Nazarene's preliminary injunction Motion. Accordingly, the Court will permit Nazarene to brief standing before dismissing the case.

*Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.* ("*NSSF*"), 80 F.4th 215, 219 (3d Cir. 2023) (quoting *SBA List*, 573 U.S. at 159).

The dispute over standing in this case lies only within the fourth element of pre-enforcement standing: whether the threat of enforcement is "credible" and "substantial." *SBA List*, 573 U.S. at 158–59; (*see* Defs.' Opp. Br., ECF No. 30 at 26–29 (disputing it exclusively)). In assessing that question, courts consider: (1) whether there has been past enforcement against the same or similar conduct; (2) whether the authority to initiate proceedings is broad—such as where "any person" may file a complaint—rather than confined to a prosecutor or agency; and (3) whether the government has disavowed future enforcement. *SBA List*, 573 U.S. at 164–65.

After an evaluation of those factors here, the Court concludes that Nazarene does not have pre-enforcement standing.

### 1. Past Enforcement

"A strong sign of future enforcement is that a law has been enforced against the plaintiff, a closely related party, or others for similar conduct." *NSSF*, 80 F.4th at 220. Here, Nazarene concedes that there have not been any prior acts of enforcement against her. And while there is a pending complaint against her filed by Cobb, as noted above Nazarene has filed a response to that complaint and the Commission has not even made the preliminary determination as to whether probable cause exists. More importantly, the Cobb complaint is automatically stayed by statute pending the outcome of this litigation, such that it is certain that no action will be taken against Nazarene until the conclusion of this litigation. Thus, to a large extent, the harm that Nazarene seeks to enjoin is already enjoined by statute.

But Nazarene argues that this statutorily mandated stay is not sufficient, that her speech is nevertheless chilled, and that the Court should issue injunctive relief that would protect and

8

insulate her from any future complaints which may be filed against her. But beyond being speculative, those complaints too would be subject to the mandatory stay pursuant to statute. Thus, there is no possibility of any enforcement against Nazarene related to the Cobb complaint or any complaint that may be filed in the future.

There being no actual threat of imminent enforcement against Nazarene, both parties rely heavily on prior decisions by the Commission and the Commissioner to frame their arguments as to the risk of future enforcement against Nazarene for purportedly "similar conduct." (*See* Pl.'s Br., ECF No. 4-1 at 26–29; Defs.' Opp. Br., ECF No. 30 at 18–26). Nazarene also relies on a 2022 Advisory Opinion issued by the Commission and insists that there exists a "credible threat of enforcement [that] is traceable to the [C]ommission and [C]ommissioner's enforcement of the Act . . . ." (Pl.'s Br., ECF No. 4-1 at 29).

Before turning to the enforcement history, the Court notes a threshold problem with Nazarene's allegations that her speech continues to be chilled despite the statutory stay: they say "little about what [she] plans to do." *NSSF*, 80 F.4th at 220. A plaintiff alleging that government action has chilled, or will chill, her speech must identify a "specific present objective harm or a threat of specific future harm." *Sherwin-Williams Co. v. Cnty. of Delaware*, 968 F.3d 264, 269–70 (3d Cir. 2020) (quotations omitted). Here, Nazarene's allegations do not meet that standard. At bottom, she seeks an injunction prohibiting Defendants from enforcing the Act in any manner that would prevent her "from speaking about matters of public concern in any medium." (Prop. Order, ECF No. 4-2 at 2; Compl., ECF No. 1 at 28 ¶ B). But she does not identify what she intends to say, to whom she intends to say it, or in what "medium." Nor does she state whether she intends to use a disclaimer which, as is evident from the Commission's prior decisions, factors prominently in the agency's analysis of whether a board member's speech violates the Act. *See Aziz v. Nikitinsky*,

9

No. C56-22, slip op. at 8 (Sch. Ethics Comm'n Oct. 17, 2022) (explaining that "the use of a disclaimer on social media can help to clarify whether an individual is speaking in his or her official capacity" though "the presence of a disclaimer is not dispositive"); *Van Allen v. Alfano*, No. C88-23, slip op. at 3–4, 13 (Sch. Ethics Comm'n June 17, 2024) (finding no violation where a social media post questioning a state-mandated curriculum included a disclaimer that effectively conveyed the views contained therein were personal, and not connected to the board member's official duties). Without these details, the Court is left to speculate about what Nazarene intends to say, whether she would include a disclaimer, whether any person is likely to file a complaint, and, critically, whether any anticipated complaint would resemble conduct Defendants have previously enforced the Act against, such that Nazarene can plausibly claim an objectively reasonable chill from possible future enforcement. *NSSF*, 80 F.4th at 220; *see also Sherwin-Williams*, 968 F.3d at 270 (affirming dismissal of declaratory and injunctive relief claims where the alleged harm depended on "what [the plaintiff] anticipates the County might allege in a hypothetical lawsuit").

This deficiency may not, standing alone, "torpedo standing." *NSSF*, 80 F.4th at 220. But it substantially weakens Nazarene's argument that Defendants' enforcement history against "closely related part[ies]" or "others" creates a credible threat that she will be exposed to enforcement for "similar conduct." *Id.* Put differently, although the Act "clearly regulates" the conduct of Board members, Nazarene's vague allegations about her intended speech "undermine[] the threat of enforcement." *Id.* It also requires the additional leap that beyond a complaint being filed against her, and beyond any such complaint being stayed against her during this litigation by statute, that the Commission would at some point in the future find probable cause, that a hearing would be held, and that some enforcement action would ultimately be taken.

Even more, a review of the past administrative decisions relied on by Nazarene reveals an uneven and sporadic body of enforcement history that itself hardly indicates a substantial threat of future enforcement against her. Nazarene relies on several Commission decisions, most notably: *In re Treston* ("*Treston I*"), No. C71-18, slip op. (Sch. Ethics Comm'n Apr. 27, 2021), *aff'd in part, rev'd in part*, *In re Treston* ("*Treston II*"), No. 208-21 SEC, slip op. (Comm'r of Educ. Sep. 30, 2021); *In re Skurbe*, Nos. C75-21, C37-22, slip op. (Sch. Ethics Comm'n July 22, 2025); *Pinto v. Cusato* ("*Pinto I*"), No. C74-23, slip op. (Sch. Ethics Comm'n July 22, 2025), *aff'd, Pinto v. Cusato* ("*Pinto II*"), No. 445-25 SEC, slip op. (Comm'r of Educ. Sep. 12, 2025); and *Kwapniewski v. Curioni*, No. C70-17, slip op. (Sch. Ethics Comm'n Dec. 17, 2019).

In each of these cases, the respondent board member repeatedly invoked their official role, referred to the school board in collective terms ("we," or "our"), discussed internal or insider confidential matters, or otherwise created the appearance of speaking on behalf of a school board. In *Treston I*, although a disclaimer was included in the board member's op-ed, the Commission censured the board member because it found the disclaimer ineffective where the op-ed repeatedly tied the member's endorsements to his board business. *Treston I*, No. C71-18, slip op. at 3, 7–9; *see also Treston II*, No. 208-21 SEC, slip op. (affirming the Commission's finding of a violation, but modifying the penalty to a reprimand). In *Skurbe*, the board member posted extensively about board matters, sometimes without disclaimers and often using insider knowledge; the Commission concluded that a reasonable observer would perceive her as speaking in an official capacity, and reprimanded the board member. *Skurbe*, Nos. C75-21, C37-22, slip op. at 2–7. In *Pinto I*, the respondent referenced his status as a board member and did not include a disclaimer in certain posts, which the Commission treated as contributing to its determination as to the official-capacity nexus, resulting in a penalty of reprimand. *Pinto I*, No. C74-23, slip op. at 2–4, 5–7 (Sch. Ethics

Comm'n July 22, 2025); *see also Pinto II*, No. 445-25 SEC, slip op. (affirming the Commission). And in *Kwapniewski*, the board member repeatedly invoked his board status while publishing aggressive and inaccurate attacks on a teacher, resulting in a "harsh penalty" of six months suspension. *Kwapniewski*, No. C70-17, slip op. at 2–4, 7–9.

On the other hand, Defendants point to several cases during the same period where the Commission has dismissed complaints related to board members' social media commentary about school-related matters, including posts critical of administrators, controversial policy issues, or other board members, and sometimes even in the absence of disclaimers. *See Bentzley v. Giordano*, No. C30-24, slip op. (Sch. Ethics Comm'n Jan. 28, 2025); *Van Allen*, No. 88-23, slip op.; *McCooley v. Johnson*, No. C63-24, slip op. (Sch. Ethics Comm'n Feb. 22, 2025); *Thor v. Patruno*, No. C34-23 (Sch. Ethics Comm'n Nov. 28, 2023). According to Defendants, this mixed history of enforcement and discipline is a product of the Commission's standard in evaluating ethics complaints: whether a "reasonable member of the public" would perceive the member as speaking in an official capacity, applying a contextual, nexus-based, and case specific inquiry in which disclaimers are relevant but not dispositive. (Defs.' Br., ECF No. 30 at 19–20); *see Aziz*, No. C56-22, slip op. at 8 (noting that ethics concerns with public statements arise only if "a reasonable member of the public could perceive that the [board member] is speaking in his or her official capacity or pursuant to his or her official duties").

The Court agrees with Defendants that this enforcement history is insufficient to show an objective chill to Nazarene preventing her from speaking "on matters of public concern in any medium." Even if Nazarene had met her initial burden and sufficiently proffered her intended speech which she claims is being chilled, which she has not, too much about this enforcement history is "vague and uncertain" to support her argument that enforcement against her is, at this

stage, substantially likely to occur. *NSSF*, 80 F.4th at 221. Compare, for instance, Nazarene's intended speech here to the conduct in *Bentzley*, a case which Nazarene notably fails to distinguish. There, the Commission declined to find probable cause under N.J. STAT. ANN. § 18A:12-24.1(e) where a board member "liked" social media posts touching on LGBTQ issues, teachers, and public education, *Bentzley*, No. C30-24, slip op. at 5, conduct materially similar to, and in some respects more pointed than, the generalized speech "on matters of public concern" that Nazarene wishes to engage in. The Commission in *Bentzley* found no probable cause to support the alleged violation of, among other Code provisions, subsection (e), even where the social media page contained no disclaimer and some people in the community "may be aware" that the respondent was a board member. *Id.* at 5, 7. That dismissal of complaints at the probable-cause stage even where the speech was controversial and education-related does not suggest an agency poised to zealously employ subsection (e) or any other provision to seek enforcement against Nazarene's described comparable expressive activity. To the contrary, it reflects a measured and fact-specific interpretation of the Act and Code that often results in dismissal of complaints before the possibility of sanction becomes concrete.

The 2022 Advisory Opinion issued by the Commission also does not go as far as Nazarene suggests.[3] (*See* Compl. Ex. A., ECF No. 1-2). For starters, the fact that the Commission issued the Advisory Opinion goes more to whether Nazarene's intended conduct "is arguably proscribed"

---

[3] Nazarene also points to training materials or a "learning manual" drafted by the New Jersey School Board Association and often circulated to board members. Even assuming the materials characterize the Act broadly, they offer little assistance in assessing the likelihood of enforcement here. The manual was not drafted, adopted, or issued by any of the named Defendants, nor does it constitute a binding or advisory interpretation of the Act by the Commission or the Commissioner. It is nothing more than an interpretation of the provisions by a third party. Accordingly, it sheds no meaningful light on how the officials charged with enforcement may interpret or enforce the statute.

rather than whether enforcement is substantially likely. *See N.J. Bankers Assoc. v. Att'y Gen. of N.J.*, 49 F.4th 849, 856 (3d Cir. 2022) (quotations omitted) ("That the [defendant] issued a 2002 Opinion interpreting [the statute] as applying to trade associations of banks, and has consistently reiterated that position . . . confirms our conclusion that [plaintiff's] intended conduct is arguably proscribed."). And the parties do not dispute that Nazarene's intended speech here is arguably proscribed by the Act.

In any event, even considering the Advisory Opinion within the substantial likelihood inquiry, it reveals little more than what can already be gleaned from the Commission's prior adversarial enforcement actions. Surely, "what the enforcer has said about enforcement plans" is relevant to the inquiry. *NSSF*, 80 F.4th at 221. But, like the enforcement actions of the past, the Advisory Opinion arose from a fact-specific request by a board member who sought guidance about participating in a Facebook group styled as a forum between parents and the board of education. (*See* Compl. Ex. A., ECF No. 1-2 at 1). In response, the Commission acknowledged what is already known: that board members "do not abdicate their fundamental rights as citizens" and that it lacks authority to regulate speech "unrelated to [a member's] position on the Board" or not occurring in that capacity. (*Id.* at 2–4). At the same time, the Commission cautioned that, depending on context, disclaimers may not eliminate the risk that statements about board matters will be perceived as made in an official capacity. (*Id.* at 3). Thus, it is true that, like the enforcement actions, the Advisory Opinion adopts a broad yet fact-specific view of when speech may be deemed connected to a board member's official role. But breadth alone does not equate to a substantial risk of enforcement. For Article III purposes, the question is not whether an agency has articulated an expansive theory or interpretation in the abstract. Rather, the critical question is whether there is a substantial likelihood that the plaintiff's intended conduct will, in practice,

14

trigger enforcement against them.

Finally, even assuming the pending Cobb complaint, which is now stayed, qualifies as "past" enforcement, it does little to advance any claim of objective chill on Nazarene. Nazarene does not appear to identify the speech at issue in the Cobb complaint as the predicate speech underlying her Complaint and Motion.[4] Even so, the Cobb complaint, when considered alongside the Commission's prior enforcement history and Advisory Opinion, does not meaningfully transform Nazarene's asserted chill from subjective to objective. The Cobb complaint is presently held in abeyance by statute pending the outcome of this litigation. And even if that statutory stay is lifted after this case is resolved, the Commission, as surveyed above, has at least as well-established a history of dismissing complaints at initial screening as it does of finding probable cause and subjecting respondents like Nazarene to a full hearing and potential penalties.

At bottom, the Commission's history of enforcement does little to advance Nazarene's case for standing. This checkered enforcement history may create line-drawing difficulties for Nazarene

---

[4] The parties' submissions are unclear as to the relationship, if any, between the pending Cobb complaint and the relief Nazarene seeks in her Complaint and Motion. The Complaint and Motion do not appear to seek a stay of the Cobb complaint specifically. Rather, Nazarene seeks broader relief enjoining enforcement of the Act as applied to her speech on "matters of public concern." (Pl.'s Br., ECF No. 4-1 at 9; Compl., ECF No. 1 at 28 ¶ B; Prop. Order, ECF No. 4-2 at 2). To the extent the Cobb complaint falls within that broader category, it is already held in abeyance by statute pending this litigation. And to the extent Nazarene seeks to bar future enforcement proceedings against her beyond the Cobb complaint, that request is necessarily even more speculative: it depends on whether any future complaint will be filed, whether the Commission will find probable cause (eventually after the stay is no longer applicable upon the resolution of this litigation), the outcome of any administrative hearing, and what sanction, if any, will follow. Thus, although the Cobb complaint may bear on irreparable harm or the general enforcement-history analysis, it adds little, if any, support to Nazarene's broader claim that future enforcement is sufficiently imminent for Article III standing, particularly because it is presently held in abeyance and, once reactivated, the Commission's alleged enforcement history provides little support for Nazarene's allegations that sanctions arising from the Cobb complaint are substantially likely.

15

and the Defendants alike, but it does not reveal "an actual and well-founded fear" that enforcement against Nazarene "is sufficiently imminent." *SBA List*, 573 U.S. at 159–60 (quotations omitted). A contrary finding on this record would "require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413. Such guesswork does not establish a sufficiently imminent Article III injury.

### 2. Enforcement Authority

The next relevant factor is: "who enforces?" *See NSSF*, 80 F.4th at 220 ("Some signs [of a substantial threat of enforcement] involve past enforcement; others concern the enforcer.").

Nazarene argues that there is a substantial threat of enforcement here because "any person" may file a complaint against her. (Pl.'s Br., ECF No. 4-1 at 28–29 (citing N.J. STAT. ANN. § 18A:12-29(a))). In fact, someone already has. Prior to filing this lawsuit, Cobb, a fellow Board member, filed an ethics complaint against Nazarene for several of her online posts. (Compl., ECF No. 1 at ¶¶ 65–67). On this point, Nazarene principally relies on *SBA List*. (*See* Pl.'s Br., ECF No. 4-1 at 28–30). There, the Supreme Court held that the plaintiffs had pre-enforcement standing to challenge an Ohio election law criminalizing false statements in the lead-up to an election. *SBA List*, 573 U.S. at 152. Under that law, any person could file a complaint with the state election commission, which then had to hold an expedited probable cause hearing before a panel of election commissioners and, if probable cause was found, proceed to a full hearing before the entire commission. *Id.* at 152–53. After the panel found probable cause against the plaintiffs, the plaintiffs sued. *Id.* The Court found pre-enforcement standing because a "substantial threat" of enforcement existed where, among other reasons, "the universe of potential complainants is not restricted" and "there is a real risk of complaints from, for example, political opponents." *SBA List*, 573 U.S. at 164.

Nazarene argues that her situation is comparably dire to that in *SBA List* because the Act permits "any person" to file a complaint with the Commission. (Pl.'s Br., ECF No. 4-1 at 28–29); *see* N.J. STAT. ANN. § 18A:12-29(a). But she overlooks two critical distinctions. First, in *SBA List*, the "threat [wa]s even more substantial given that the [elections commission] panel actually found probable cause" and thus the accused was required to defend their case in an adversarial hearing before a full commission on an expedited basis which the Court found to be burdensome and disruptive to the electoral process. 573 U.S. at 164. But here, the pending complaint against Nazarene has not yet been screened for probable cause and indeed is mandatorily stayed pending the outcome of this litigation. Coupled with the checkered enforcement history noted above, it is no more likely—let alone *substantially* likely—that the Commission finds probable cause, than it is that they dismiss the complaint outright as frivolous. How the Commission will decide the pending complaint against Nazarene, or any other complaint that may be filed against her during the pendency of this litigation and upon lifting of the mandatory stay, is speculative at best.

Second, the *SBA List* Court placed significant emphasis on the fact that the potential penalties at issue were criminal. In that case, "the combination of" the all-but-certain adversarial proceedings with "the additional threat of criminal prosecution . . . suffice[d] to create an Article III injury under the circumstances . . . ." *Id.* at 166. But here, the penalties Nazarene potentially faces are entirely civil and administrative in nature. While not minimizing the consequences, civil and administrative penalties invariably "lower the temperature." *NSSF*, 80 F.4th at 222. Additionally, her premature challenges here to the Act's application "can be raised as affirmative defenses later." *Id.*

The Act's enforcement and disciplinary scheme, and Nazarene's current circumstances, more closely resemble *Greenberg v. Lehocky*, 81 F.4th 376 (3d Cir. 2023). There, a new

17

Pennsylvania attorney-discipline rule prohibited licensed attorneys from manifesting bias or prejudice in the practice of law. *Id.* at 380–81. Any person could file a complaint alleging a violation. *Id.* at 379. Once filed, complaints were screened and could be dismissed as frivolous or meritless. *Id.* at 379–80. A Pennsylvania attorney who regularly presented seminars on First Amendment issues sued, asserting pre-enforcement standing based on the possibility that his discussion of sensitive topics might trigger a complaint, even though no complaint had been filed against him. *Id.* at 381. The Third Circuit held that pre-enforcement standing was lacking, emphasizing that "[t]he relevant analysis focuses on those responsible for enforcement, not those who make groundless complaints." *Id.* at 387–88. Combined with the lack of enforcement history and the enforcer's ability to "weed[] out meritless complaints on its own," pre-enforcement standing did not exist because, even assuming a complaint would be filed, there was only a "highly attenuated chain of possibilities" that enforcement would occur. *Id.* (citing *Clapper*, 568 U.S. at 401).

Here, like *Greenberg*, the Act's enforcement scheme "does not proceed directly from complaint to enforcement." *Id.* at 388. Nor is the Act's screening function a perfunctory rubber stamp. The Commission has, even recently, dismissed complaints for lack of probable cause prior to referring the matter to an administrative hearing. *See Bentzley*, No. C30-24, slip op., at 2, 4–6. And without a consistent body of enforcement history, "it is speculative that a disciplinary complaint," including the one currently pending against Nazarene, "would progress to the point of

18

a formal response from [her], much less disciplinary enforcement."[5] *Greenberg*, 81 F.4th at 388.

All of this is not to suggest that Nazarene must *per se* wait for an ethics complaint to proceed through a probable cause screening in order to establish pre-enforcement standing. That requirement would be inconsistent with settled precedent. *See, e.g.*, *SBA List*, 573 U.S. at 158–59 (noting the well-established principle that plaintiffs need not expose themselves to enforcement before bringing a pre-enforcement challenge). But Article III requires more than a plaintiff's subjective apprehension that enforcement is imminent. And if the "relevant analysis" focuses on the Commission's conduct, *Greenberg*, 81 F.4th at 378, and nothing in its past enforcement history meaningfully supports an inference of substantially likely enforcement against Nazarene's speech on "matters of public concern" in "any medium," then the mere fact that any member of the public may file an ethics complaint does little to move the asserted threat by Nazarene beyond speculation or a self-imposed chill.

### 3. *Disavowal of Future Enforcement, and Other Considerations*

Finally, the Court must consider what the Commission has to say about the prospect of enforcement against Nazarene. *See SBA List*, 573 U.S. at 165. The parties agree that neither the Act nor the Code has provisions that directly restrict school board members' communications about school-related issues. (Compl., ECF No. 1 at ¶ 17; Defs.' Br., ECF No. 30 at 19). Rather, the focus is on how the Commission has particularly enforced subsection (e) of the Code, requiring

---

[5] Although Nazarene elected to submit a written response to the ethics complaint filed against her, the Act does not require an accused board member to do so as a prerequisite to obtain dismissal at the probable cause stage. *See* N.J.S.A. § 18A:12-29(b). The Commission reviews complaints to determine whether probable cause exists and may dismiss, on its own accord, those it finds frivolous or unsupported at that stage. *Id.* Thus, Nazarene's decision to respond to the complaint currently pending against her, or any that might be filed in the future, does not affect whether she has pre-enforcement standing. And she could not be subjected to the expedited proceedings that were of substantial concern in *SBA List*.

Board members to "recognize that authority rests with the board of education" as an entity, and that they not take "any private action that may compromise the board." N.J. STAT. ANN. § 18A:12-24.1(e).

The parties disagree, though not sharply, on whether the Defendants have meaningfully disavowed enforcement against Nazarene's intended speech, broadly construed as Nazarene speaking on matters of public concern in a personal capacity in any medium. Nazarene argues that the State has "not disavowed its opinions and decisions" and has provided no assurance that the Commission will refrain from pursuing her. (Pl.'s Reply Br., ECF No. 31 at 6). In her view, the absence of a formal renunciation of prior decisions, combined with the pending complaint against her, confirms a credible threat of enforcement. (*See id.*). And "[t]hough [Defendants] promise[] Nazarene *might* be able to say everything she wishes without punishment, courts do 'not uphold an unconstitutional statute merely because the Government promised to use it responsibly.'" (*Id.* at 10 (emphasis in original) (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

Defendants indeed stop short of a total disavowal of enforcement authority. The most they state is that "the Commission's existing decisions" do not give rise to a "reasonable fear [of] an enforcement action," and that Nazarene is "free" to post as she pleases on matters of public concern so long as she uses "an appropriate disclaimer." (Defs.' Opp. Br., ECF No. 30 at 25, 28).

To Nazarene's credit, Defendants' purported disavowals are not sufficient on their own to defeat standing. The relevant inquiry is whether the state disavows *any* interpretation of a statute that would "make it applicable in any way" to the plaintiff. *Johnson v. Stuart*, 702 F.2d 193, 195

(9th Cir. 1983). While disavowal may be more readily ascertainable in facial challenges[6] to a statute, the Defendants still have not clearly or affirmatively stated that Nazarene's conduct falls outside the purview of the Act. Indeed, it is hard to see how they could without totally abandoning any enforcement of the Act, because the Act, and more precisely the Code, directly regulates the conduct of board members like Nazarene. And, to the extent Nazarene's case is limited to the state's application of subsection (e) alone, it would be disingenuous to state that Defendants would excise only that portion of the Code from its enforcement authority. Moreover, Defendants' reliance on the ability for board members to use disclaimers in their public commentaries does not materially shift the disavowal analysis in their favor. As candidly stated in some of the Commission's past decisions, "the presence of a disclaimer is not dispositive" in shielding a board member from Act violations. *Aziz*, No. C56-22, slip op. at 8. By Defendants' admission then, the use of disclaimers does not leave Nazarene and other board members "without some reason in fearing prosecution." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 302 (1979).

However, the Defendants' inadequate disavowal of enforcement authority is insufficient to overcome the other factors to be considered in the pre-enforcement standing inquiry. As discussed above, Nazarene's allegations amount to "subjective chill," not "specific present objective harm" or a "threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). Her stated intent to speak on "matters of public concern" in "any medium," viewed against the Commission's

---

[6] Although the Complaint alleges that the School Ethics Act, as interpreted by the State, violates the First Amendment on its face, (*see* ECF No. 1 at ¶ 92), Nazarene advances only an as-applied challenge in her Motion. (*See* ECF No. 4-1 at 33–41). Indeed, the Court presently observes no facial invalidity issue because, as Nazarene concedes, neither the Act nor the Code have provisions directly restricting school board members' communications with constituents. (*See* ECF No. 1 at ¶ 17). In light of that concession, she cannot plausibly contend that the Act is unconstitutional "based on its text alone." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010).

21

inconsistent and fact-intensive enforcement history, does not establish that enforcement against her is "certainly impending" so as to create injury in fact at the pre-enforcement stage. *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

To be sure, the Commission's prior opinions and the Advisory Opinion suggest that there exists some possibility of enforcement in which Nazarene's intended conduct—rightly or wrongly—*could possibly* be subject to sanction. For that reason, Defendants cannot wholly, or genuinely, disavow their enforcement authority. But the Commission's actual enforcement history provides little support for the proposition that Nazarene faces a substantial likelihood of sanction for her intended speech, broadly alleged as speech on "matters of public concern."

Resolving any doubt again is that the contemplated injury for Nazarene is entirely civil and administrative. As the Third Circuit has observed, where the standing inquiry presents a close question, "the distinction between criminal and civil sanctions might tip the balance."[7] *NSSF*, 80 F.4th at 223 (quoting 13B Charles Alan Wright et al., *Federal Practice and Procedure* § 3532.5 (3d ed. 2023)). "With the scales already tipped against [Nazarene], the lack of criminal penalties seals the case against [her]." *Id.*

****

---

[7] The Supreme Court and the Third Circuit have left open whether "the threat of administrative penalties alone would be enough for standing." *NSSF*, 80 F.4th at 223; *SBA List*, 573 U.S. at 165–66. Even assuming that it could be, this case is a poor vehicle for so holding. The Commission's enforcement history shows that the ordinary sanctions for violations of the Act are censure, *Treston I*, No. C71-18, slip op. at 3, 7–9, and reprimand, *Skurbe*, Nos. C75-21, C37-22, slip op. at 2–7, with suspension reserved only for the most egregious cases, *Kwapniewski*, No. C70-17, slip op. at 2–4, 7–9. Moreover, in some cases, the Commissioner has modified the Commission's recommended penalty downward. *Treston II*, No. 208-21 SEC, slip op.  Thus, these often non-pecuniary civil sanctions, imposed through state administrative proceedings rather than full-blown litigation, do not show that the "stakes are high and close at hand" such that the threat of civil enforcement on its own could constitute sufficient Article III injury in a pre-enforcement challenge. *NSSF*, 80 F.4th at 223.

In sum, the Court finds that Nazarene has failed to establish standing for purposes of the instant Motion. She has not shown that enforcement of the Act and its Code against her intended speech is substantially likely, as required to establish pre-enforcement standing. The Commission's prior decisions reflect a fact-specific and uneven enforcement history, not a clear or consistent pattern of sanctioning personal-capacity speech accompanied by disclaimers. The existence of a screening mechanism, the absence of any probable-cause finding here, the statutory abeyance now in place, and the purely civil nature of any potential sanction further attenuate the alleged threat.

Although Plaintiff may reasonably prefer greater clarity in the line between personal and official speech, Article III requires more than uncertainty to support a pre-enforcement challenge. Accordingly, the Motion for Preliminary Injunction will be denied for lack of standing. Before dismissing the Complaint on the same basis, however, the Court will afford Plaintiff an opportunity to show cause why the Complaint should not be dismissed for lack of a constitutionally sufficient injury in fact.

## CONCLUSION

For the foregoing reasons, Nazarene's Motion for a Preliminary Injunction, (ECF No. 4), is **DENIED**. Nazarene is further **ORDERED TO SHOW CAUSE** why the Complaint, (ECF No. 1), should not be dismissed for lack of standing. An appropriate Order accompanies this Opinion.

Date: May 26, 2026

**CHRISTINE P. O'HEARN**
**United States District Judge**

23